**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| IN RE | |
| **NAIM M. MUSTAFA** | **CASE NO. 15-52410** |
| DEBTOR | |
| **CENTRAL BANK & TRUST CO.** | **PLAINTIFF** |
| V. | **ADV. NO. 16-5011** |
| **NAIM M. MUSTAFA** | **DEFENDANT** |

**MEMORANDUM OPINION**

This matter is before the Court for an evidentiary hearing on an Objection to Confirmation by Creditor Central Bank & Trust Co. ("Central Bank") [Case No. 15-52410, ECF No. 15] and a trial on the Plaintiff Central Bank's Complaint [Adversary No. 16-5011, ECF No. 1] alleging a debt of $17,862.39 as of December 11, 2015, plus interest, costs, expenses and reasonable attorneys' fees pursuant to Central Bank's Proof of Claim No. 2, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) and § 523(a)(6).

The allegations in Central Bank's Objection and Complaint arise from the same set of facts and raise similar issues regarding: (1) the Defendant Debtor's intent when he borrowed funds from Central Bank to purchase a vehicle and proposed to surrender the vehicle in his chapter 13 plan; and (2) the dischargeability of the underlying debt. The Court held the evidentiary hearing and trial concurrently on September 6, 2016. Upon consideration of the parties' stipulation of facts, testimony and exhibits admitted into evidence, the record, and the

1

arguments of counsel, the Court finds: (1) the debt owed to Central Bank is non-dischargeable pursuant to § 523(a)(2) and § 523(a)(6); and (2) the Debtor's chapter 13 plan is not confirmable.

**I.    FACTS.**

    **A.  Saja, LLC, d/b/a Everyday Auto Sales.**

In 2003, the Debtor Defendant Naim M. Mustafa formed Saja, LLC, d/b/a Everyday Auto Sales ("Saja"). Through Saja, Mustafa operated a used-car dealership in Lexington, Kentucky. As the sole member of Saja, Mustafa worked on the used-car lot daily and was regularly involved in customer financing. This and other evidence shows Mustafa is very familiar with the rules and regulations governing the sale and purchase of motor vehicles.

Saja financed its inventory with floor plan financing. Each loan advance was made against a specific vehicle and repaid when the vehicle is sold. If a vehicle sat on the car lot more than 60 days, Saja would lose money. To avoid this loss, Mustafa caused Saja to "re-floor" any vehicle held in inventory over 60-days with a different company.

In 2013, Saja began experiencing problems with the floor plan financing. Mustafa testified that the floor plan lenders continued to sweep Saja's business checking account on a regular basis but did not timely release titles to the vehicles. These problems caused Saja to experience financial difficulties, forcing Mustafa to take out a second mortgage against his home to attempt to save his business. Mustafa invested some or most of the loan proceeds from the second mortgage into Saja, which kept Saja afloat for a period of time, but Saja eventually filed chapter 7 bankruptcy in May 2015.

### B. The Purchase of the Mercedes and Loan from Central Bank.

On April 9, 2014, Mustafa attended an auction in Clarkesville, Indiana. Mustafa, acting on behalf of Saja as Everyday Auto Sales, signed an auction sale contract that provided for the purchase of a 2007 Mercedes-Benz S-Class Sedan 4D S550-NG71 (the "Mercedes") for $19,335.00. Mustafa testified he believed the Mercedes was a good deal because it had a NADA value of $30,000.00. Mustafa testified that he intended to purchase the Mercedes as a "company vehicle," but he did not want to include the Mercedes as part of his floor plan financing because of the high fees and interest rate. So Mustafa decided to seek alternative financing.

On April 17, 2014, Mustafa approached Laura Owens at Central Bank and requested a loan to finance the purchase of the Mercedes. Owens was familiar with Mustafa and his used-car dealership. Central Bank held the second mortgage on Mustafa's home and had previously loaned money to Mustafa in other capacities. Mustafa also kept Saja's business checking account at Central Bank.

Mustafa brought Owens a consumer loan credit application that he filled out in his individual name prior to arriving at the Bank. Being familiar with Mustafa's used-car business, Owens sought to clarify the nature of the loan and asked Mustafa if he wanted to purchase the Mercedes in his name and the reason for its purchase. Mustafa told her that he liked the Mercedes and did not want anyone else to purchase it.

Owens testified that she later contacted Mustafa at the request of her supervisor to confirm he would use the Mercedes for his personal, family or household use. He again told her that he liked the Mercedes and did not want anyone else to purchase it. Mustafa also told her that he would drive it for a while and then let his wife drive it. Mustafa testified that Owens knew he wanted to purchase the Mercedes as a company vehicle, but Owens credibly denied any

3

knowledge of this fact.   Relying on Mustafa's representations to Owens and the representations made on his consumer credit application, Central Bank approved the loan.

In an attempt to explain why he sought a consumer loan for a vehicle that he planned to use as company vehicle, Mustafa testified that he was running out of time to pay the purchase price on the Mercedes and the commercial loan process with Central Bank was too time-consuming and cumbersome.  As an alternative, he sought a consumer loan in his individual name instead.  Mustafa claims he sought a consumer loan at Owens' suggestion, which she denied.  One reason Owens testimony is more credible is because Mustafa presented Owens with a consumer credit application that was filled out prior to their meeting.

On April 18, 2014, Mustafa, in his individual capacity, borrowed $21,642.70 from Central Bank (the "Loan") and executed and delivered a Note, Disclosure and Security Agreement to evidence the Loan (the "Note and Agreement").  Mustafa granted Central Bank a lien upon and security interest in the Mercedes as security for the Loan.  Central Bank properly perfected its security interest in the Mercedes by notation of same on the certificate of title.

The Note and Agreement signed by Mustafa provides, in relevant part:

> **Duties Toward Property**.  I will protect the [Mercedes] and your interest against any competing claim. Except as otherwise provided in this Loan Agreement, I will keep the [Mercedes] in my possession at the address indicated on this Loan Agreement.  I will keep the [Mercedes] in good repair and use it only for personal, family, or household purposes.  I will immediately inform you of any loss or damage to the [Mercedes].  You have the right of reasonable access to inspect the [Mercedes].
>
> . . . .
>
> I will not sell, lease, or otherwise transfer or encumber the [Mercedes] without your prior written consent.  You do not authorize any sale or other disposition of the [Mercedes].   Any sale or disposition you do not authorize will violate your rights. If I pledge the [Mercedes] to you (deliver the [Mercedes] into you, or your designated third party's possession or control)

4

> I will, upon receipt, deliver any proceeds and products of the [Mercedes] to you. I will provide you with any notices, documents, financial statements, reports, and other information relating to the [Mercedes] I receive as the owner of the [Mercedes].

[*See* Pl. Ex. 1, ECF No. 7-1, at 3.] The Note and Agreement contain other similar representations and restrictions throughout.

Mustafa directed Central Bank to deposit the Loan proceeds in Saja's business checking account and withdraw the regular monthly payments from the same account. Central Bank made the check payable to Mustafa and Everday Auto Sales and deposited it as requested. Mustafa then caused Saja to pay the purchase price for the Mercedes with the Loan proceeds. Owens testified that she did not think this was out of the ordinary because checks are often made payable to the purchaser and the car lot and, based on Mustafa's representations to her, Owens assumed the Mercedes was acquired from Saja's inventory.

### C.  The Lease and the Sale of the Mercedes.

On April 17, 2014, the same day Mustafa presented the consumer credit application for the Loan to Owens, Mustafa asked a Saja employee to prepare the Lease Agreement transferring the Mercedes to Saja. Mustafa executed the Lease Agreement the next day, when the Loan was approved and the proceeds disbursed.

Mustafa explained that he leased the Mercedes to Saja so he could insure it under Saja's commercial policy. Mustafa testified that he dropped off the Lease Agreement and proof of insurance to the Bank showing the Mercedes was insured under Saja's name. Contrary to Mustafa's testimony, Owens credibly testified that he did not inform her of the Lease or provide proof of insurance. According to Owens, Mustafa provided her the name and address of his insurer, as required by Central Bank when applying for a car loan. She then followed procedure

5

by contacting the insurer to verify the address, which was correct, and sent the information to a separate department at Central Bank for verification that the Mercedes was insured. Owens further testified insuring the Mercedes under Saja would not have affected Mustafa's application as long as he provided proof the Mercedes is insured with the Bank named as loss payee.

Mustafa testified that he added Everyday Auto Sales' logo to the Mercedes and drove it as a company car. Less than a month after the purchase and lease, a friend and his wife from North Carolina expressed interest in the Mercedes. Mustafa testified that he did not intend to sell the Mercedes when he bought it, but saw an opportunity to make a profit. On May 10, 2014, Mustafa caused Saja to sell the Mercedes to Samerah Ismail Awad (the "Purchaser") for $30,000.00. The Purchaser paid the purchase price with four post-dated checks for $7,500.00 (June-September). Mustafa deposited each check in Saja's business checking account and caused Saja to use the proceeds to pay Saja's business expenses. Neither Mustafa nor Saja informed Central Bank of the sale or the existence of the sale proceeds.

Mustafa continued to cause Saja to make monthly payments on the Mercedes from Saja's business checking account until April 2015. Mustafa testified that the payments stopped because Saja could not pay its debts due to issues with Saja's floor plan financing. Central Bank attempted to collect the debt through letters and phone calls to Mustafa. One collection call reached Mustafa, who informed Central Bank that he would make a payment, but no additional payments were made.

**D. Saja's Chapter 7 Bankruptcy**.

On May 22, 2015, Mustafa caused Saja to file a chapter 7 petition in the United States Bankruptcy Court for the Eastern District of Kentucky, Case No. 15-51050. Saja did not list Central Bank as a creditor or provide notice of the filing to Central Bank. Saja's chapter 7 case was closed on September 29, 2015.

**E. Mustafa's Chapter 13 Bankruptcy**.

On December 11, 2015 (the "Petition Date"), Mustafa filed the underlying chapter 13 petition. Mustafa listed the debt owed to Central Bank on Schedule D and provided that "Debtor sold this vehicle to his company, Saja, LLC, and then Saja sold it to a buyer in North Carolina. However, Saja did not pay off the lien against the title prior to the filing of the Saja bankruptcy ca [*sic*]." Mustafa said he knew Central Bank's lien was not satisfied when he transferred the Mercedes to his company. He also admitted he knew Central Bank's lien should have been paid in full when the Mercedes was sold to his friend's wife and taken to North Carolina.

Central Bank was unaware the Mercedes was sold and not in Mustafa's possession until Mustafa filed bankruptcy. Central Bank filed Proof of Claim No. 2 showing a Loan balance of $17,862.39 as of the Petition Date. The amount currently due is higher because of accruing interest, attorneys' fees, expenses and costs.

**F. Mustafa's Chapter 13 Plan and Central Bank's Objection**.

On December 11, 2015, Mustafa filed his Chapter 13 Plan (the "Plan") proposing to surrender the Mercedes to Central Bank pursuant to § 1325(a)(5)(C). His Plan proposes to pay $50.00 per month. The payment will satisfy administrative expenses, but will not provide a dividend to unsecured creditors.

7

Central Bank objects to confirmation. Central Bank argues Mustafa cannot surrender the Mercedes through the Plan in conformity with § 1325(a)(5)(C) because he cannot physically deliver the Mercedes to Central Bank. According to the Bank, Mustafa created the circumstances that prevent physical delivery of the Mercedes so he is not acting in good faith by proposing the surrender. On March 17, 2016, the Bank also filed a separate adversary complaint against Mustafa alleging that the Central Bank debt is non-dischargeable pursuant to § 523(a)(2)(A) and § 523(a)(6).

### G. Current Status of the Mercedes.

The Mercedes remains titled in the state of Kentucky under Mustafa's name with Central Bank listed as the first lienholder. Steve Hall, Vice President of Special Assets at Central Bank, testified the Mercedes is currently located in a body shop in North Carolina. According to Hall, the Mercedes was towed in because it would not start and the North Carolina body shop performed over $10,000.00 in repairs on it. The body shop refuses to release the Mercedes without payment.

Mustafa has not taken any steps to retrieve the Mercedes or physically deliver the car to Central Bank. Central Bank has hired counsel and is exploring repossession of the Mercedes. Central Bank's North Carolina attorneys' fees are over $10,000.00 to date.

## II. JURISDICTION.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409.

**III.    DISCHARGEABILITY OF THE DEBT.**

The issue in the adversary proceeding is whether the debt due to Central Bank is dischargeable under § 523(a)(2)(A) and § 523(a)(6).  Each count of the Complaint is addressed separately below.

### A.  Count I - 11 U.S.C. § 523(a)(2)(A).

Count I of the Complaint seeks a determination that the debt is non-dischargeable under § 523(a)(2)(A).  "A discharge under section 727....of this title does not discharge an individual debtor from any debt- …

>   (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by
>
>   (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtors or an insider's financial condition...

11 U.S.C. § 523(a)(2)(A).

Central Bank must prove the following by a preponderance of the evidence to succeed under § 523(a)(2)(A):

>   (1)  Mustafa obtained money through a material misrepresentation that at the time, Mustafa knew was false or made with gross recklessness as to its truth;
>   (2)  Mustafa intended to deceive the Bank;
>   (3)  the Bank justifiably relied on the false representation; and
>   (4)  the Bank's reliance was the proximate cause of their loss.

*See Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-281 (6th Cir. 1998).  Exceptions to discharge are strictly construed against the creditor.  *Id.* at 281.

The evidence shows Mustafa knowingly made material misrepresentations to Owens and Central Bank to obtain approval of a consumer loan for a vehicle that he did not intend for

personal, household or family use. Mustafa acted with intent to deceive Central Bank about the nature of the purchase, and the use and disposition of the Mercedes and related proceeds.

A material misrepresentation is defined as "substantial inaccuracies of the type which would generally affect a [creditor's] decision." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003) (*citing Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996). Further, "false representations and pretenses encompass statements that falsely purport to depict current or past facts." *Id.* at 760 (*citing Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983)). False pretenses include statements that involve an implied misrepresentation or conduct intended to create or encourage a false impression. *Id.*

Whether a debtor possesses an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard. *Rembert*, 141 F. 3d. at 281. A debtor's intention or lack thereof is ascertained by the totality of the circumstances. *Id.* at 282. A plaintiff may establish fraud by direct, as well as circumstantial, evidence. *See Bluegrass Stockyards of Campbellsville, LLC v. Smith (In re Smith)*, 429 B.R. 864, 870 (Bankr. W.D. Ky. 2010).

Mustafa's testimony and actions show that he never intended to use the Mercedes as a personal vehicle, despite representations to the contrary. Mustafa bought the car at auction on behalf of Saja as Everyday Auto Sales. Mustafa leased the Mercedes to Saja immediately after or contemporaneously with execution of the Note and Agreement. Mustafa also quickly added Saja's logo to the Mercedes and parked the car in the front of his lot. Mustafa also testified he never intended to let his wife use the Mercedes, contrary to Owens' testimony.

Despite the strong evidence of intent to use the Mercedes as a company car, Mustafa delivered a consumer loan application to Owens. Mustafa told Owens both times she inquired that he and later his wife would use the Mercedes as a personal vehicle and he would not sell it. Central Bank justifiably relied on these representations and the consumer loan application to grant the Loan. *See Field v. Mans*, 516 U.S. 59, 70 (1995).

The evidence shows Mustafa had reasons to avoid financing the Mercedes as a company car. Mustafa intentionally avoided a floor plan loan to finance the purchase because of high fees and ongoing problems with his floor plan lenders. Mustafa also could not afford to wait for a commercial loan from Central Bank because the application required extensive background information that would take time to gather and prepare. Mustafa needed to act quickly because he testified the auction company usually only gave him seven days to pay for a vehicle, but he did not even submit the consumer loan application to Owens until the seventh day after the auction sale.

Mustafa's actions after obtaining the Loan also point to a conscious effort to mislead Central Bank. Mustafa sold the Mercedes to an out-of-state purchaser and did not attempt to transfer title. Mustafa let Saja use the proceeds of the sale to pay its own debts, contrary to the terms of the Note and Agreement. Mustafa also continued to make the monthly payments so Central Bank would not know the vehicle was no longer in Kentucky. Mustafa even failed to disclose the transaction or Saja's obligation to Central Bank on Saja's bankruptcy schedules.

Central Bank has met its burden of proof by a preponderance of the evidence and the debt owed to Central Bank by Mustafa is non-dischargeable pursuant to § 523(a)(2)(A). The totality of the circumstances show Mustafa had a subjective intent to mislead Central Bank when he

                      Document      Page 12 of 16

applied for the Loan. Mustafa also made intentionally false representations to conceal the sale of the Mercedes so Saja could use the proceeds to pay its own expenses.

### B. Count II - 11 U.S.C. § 523(a)(6).

Count II of the Complaint seeks a determination that the debt is non-dischargeable under § 523(a)(6). Section 523(a)(6) provides:

> A discharge under section 727....of this title does not discharge an individual debtor from any debt- …
>
> ….
>
> (6)  for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6). Central Bank has the burden of proof by a preponderance of the evidence that its loss is the result from conduct that is both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *Bank of Kentucky, Inc. v. Nageleisen (In re Nageleisen),* 523 B.R. 522, 529 (Bankr. E.D. Ky. 2014).

The facts justifying a finding of non-dischargeability under § 523(a)(2)(A) lead to the same conclusion under § 523(a)(6). Mustafa leased and sold the Mercedes contrary to his representations to Owens and the terms of the Loan. He thereafter caused Saja to keep the proceeds from the sale, which he knew belonged to the Bank, and used them to pay Saja's debts. This is intentional conversion under Kentucky law. *See, e.g., Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866, 870 (Bankr. W.D. Ky. 2001) (debtor's act of assuming control over creditor's insurance proceeds, which clearly belonged to creditor under the parties' security agreement, amounted to conversion of creditor's property under Kentucky law); *State Auto Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626 (Ky. App. 1990) (complaint alleging that creditor had security interest in automobile, that owner defaulted, that automobile

had been acquired by third party with its present whereabouts being unknown, and that automobile was being wrongfully withheld, was sufficient to state cause of action for conversion).

Intentional conversion of another's property is a willful and malicious injury under § 523(a)(6). *See, e.g., Ewers v. Cottingham (In re Cottingham)*, Adv. No. 10-2001, 2011 WL 2118247 (Bankr. E.D. Ky. May 27, 2011). *See also Post Road Partners, LLC v. Walter (In re Walters)*, 359 B.R. 156 (Bankr. E.D. Ky. 2006) ("Conversion, in Kentucky the wrongful exercise of dominion and control over the property of another, may be considered a willful and malicious injury."). There is nothing in the facts of this case to suggest Mustafa should receive any benefit of any doubt regarding the willful and malicious nature of his actions.

Thus, Central Bank has met its burden of proof by a preponderance of the evidence and the debt evidenced by the Loan is non-dischargeable under § 523(a)(6).

### C. Count III - Attorneys' Fees.

Proof of Claim No. 2 confirms a secured debt of $17,862.39 owed to Central Bank, plus interest, costs, expenses, and attorneys' fees, which is not disputed by Mustafa. Count III specifically seeks reasonable attorneys' fees, expenses and costs incurred to collect the amounts due, which would at least include attorneys' fees, costs and expenses in the main bankruptcy case and adversary proceeding and local counsel fees in North Carolina.

Attorneys' fees in a non-dischargeability action are non-dischargeable where the contract creating the debt authorizes the fees and is enforceable by state law. *Cohen v. De La Cruz*, 523 U.S. 213, 223 (1998); *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir. 1985); *Sager v. Bennett (In re Bennett)*, Adv. No. 14-2008, 2015 WL 94549 at *1 (Bankr. E.D. Ky. Jan. 7, 2015). The terms of the Loan provide for the recovery of collection expenses,

13

including but not limited to, attorneys' fees, court costs and other legal expenses. [Plf. Ex. 1, ECF No. 7-1, at 2.] Thus Central Bank is awarded its postpetition attorneys' fees, expenses and costs.

## IV.   OBJECTION TO CONFIRMATION

Central Bank also objected to confirmation of the Debtor's chapter 13 plan. Central Bank argues the proposal to surrender the Mercedes to the Bank pursuant to § 1325(a)(5)(C) is illusory because Mustafa cannot physically deliver a vehicle he wrongfully sold to an out-of-state third-party purchaser. Thus, the issue is whether the Mustafa's proposal to surrender is made in good faith. [*See* Case No. 15-52410, ECF No. 45 (*citing In re Ware*, 533 B.R. 701, 712 (Bankr. N.D. Ill. 2015) ("Property that is not capable of physical delivery because the debtor has lost possession of it may be surrendered as a legal matter without physical delivery if the record is absent of evidence of the debtor's lack of good faith.")).]

A debtor bears the burden of proving his good faith. *See Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123, 1126 (6th Cir. 1990) ("The party who seeks a discharge under Chapter 13 bears the burden of proving good faith."). Mustafa has failed to meet that burden because he knows, or should reasonably know, that Central Bank cannot repossess the Mercedes without significant time and expense as a direct result of his actions.

The conclusion that the debt is non-dischargeable based on Mustafa's false and misleading actions, which were a direct cause of the Bank's loss, also impacts this analysis. [*See supra* at Section III.A and B.] Mustafa knew he sold the Mercedes to an out-of-state purchaser and purposefully did not attempt to transfer title to the vehicle because it would have revealed his scheme. It is not unfair to place blame on Mustafa for any mechanical problems or damage to the Mercedes that occurred out of state.

The Mercedes is now lodged in a body shop in North Carolina subject to a statutory lien for repairs and storage that will require a payment of at least $10,000.00 to obtain release. Further, Hall testified that the mechanic suggested the transmission requires repair, adding another unknown layer of costs. Hall also expressed an expectation that some legal action is required in North Carolina, thus increasing a legal bill for local counsel that already exceeds $10,000.00.

Mustafa has made no effort to retrieve the Mercedes and the evidence shows Central Bank cannot reasonably retrieve the Mercedes offered for surrender because of Mustafa's actions. Thus, Mustafa is not acting in good faith by proposing to surrender the Mercedes under § 1325(a)(5)(C) and the Plan is not confirmable.

The Plan is not confirmable even if there were no good faith issues surrounding the surrender of the Mercedes. Mustafa admitted that he and his wife received a tax refund check last spring exceeding $8,000.00 that is not included on Schedule I. The testimony also revealed other reasons to believe the income disclosed by Mustafa and his non-debtor wife on Schedule I is incomplete. Mustafa's counsel conceded during the evidentiary hearing and trial that this testimony did prove the Plan was not confirmable in its current form.

Mustafa's counsel made an oral motion to continue the trial and evidentiary hearing to present evidence addressing Schedule I issues, but the motion was denied because the proposed Plan is not confirmable anyway and Mustafa may address the issues at a continued confirmation hearing. Thus, Central Bank's objection to confirmation is sustained and Mustafa shall have 14 days to amend the Plan to address the issues raised at the evidentiary hearing and trial, as well as this Opinion. The chapter 13 trustee may then re-notice the confirmation hearing to address whether the Plan, as amended, is confirmable. If an amended plan is not filed within the time

allowed, the chapter 13 trustee should tender an order dismissing the case based on delay that is prejudicial to creditors.

## V. CONCLUSION.

Based on the foregoing, the debt owed to Central Bank in the amount of $17,862.39, plus attorneys' fees, expenses, and costs as provided by the underlying contract, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6).

Further, Central Bank's Objection to Confirmation is sustained and Mustafa shall have 14 days to amend the Plan. A separate Judgment and Order will be issued concurrent with this Memorandum Opinion.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Wednesday, September 14, 2016**
(grs)